J-A03026-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| Z.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| J.L. | : | No. 1305 WDA 2018 |

Appeal from the Order Entered August 17, 2018
In the Court of Common Pleas of Beaver County Civil Division at No(s):
No. 10567 OF 2015

BEFORE:   BOWES, J., SHOGAN, J., and STRASSBURGER*, J.

MEMORANDUM BY SHOGAN, J.:                    **FILED MARCH 15, 2019**

Z.S. ("Father") appeals from the order that denied his exceptions to the proposed custody order of the hearing officer and maintained shared legal custody in Father and  J.L. ("Mother") of their daughter, H.S. ("Child") (born in December of 2007).  The order awarded primary physical custody of Child to Mother and partial physical custody to Father.  After careful review, we affirm.

The trial court provided the following factual background:

> The parties married in [September of 2006, separated in September of 2012, and divorced in May of 2016].  [**See** N.T., 7/20/18, at 110, 199–200.]   One (1) child was born of the marriage: H.S., age ten (10).  After the parties' separation, Mother resided in Mount Washington in Pittsburgh, [Allegheny County,] while Father moved in with Paternal Grandparents in Beaver County.  Thereafter, Father and [Child] moved in with his then-fiancé[e] and her daughter in Moon Township[, Allegheny County].  Father and [Child] then moved into their own apartment in Moon Township after the previous living situation grew

_____
\*   Retired Senior Judge assigned to the Superior Court.

unsustainable. According to Father, due to [Child's] behavior, Father and his then-fiancé[e] ended their relationship. In 2015, Father began dating his now wife, [J.S.] ("Wife") [or ("Stepmother")], who then[]resided in West Virginia. [Father and Stepmother] wed in December of 2017. Father had begun his employment [in Greene County], Pennsylvania, which resulted in a one and one-half (1½) hour commute from Moon Township. Because Father worked a variety of shifts, [Child] began to spend long periods of time with Paternal Grandparents in Beaver County while still attending school in Moon Township, in [Allegheny County]. . . .

* * *

After the parties separated, the parties operated under a shared custody agreement, created independent[ly] of the [c]ourts. However, after Father filed a Complaint for Custody in 2015, the parties were able to come to an agreement as to custody. The parties, in an Agreed Order, agreed that[,] due to the better schools in Moon Township, Father, who then[]resided in Moon Township, would have custody Monday until Friday at 5:30 p.m. with Mother having custody on the first, second, third, and any fifth weekend of every month from Friday at 5:30 p.m. to Monday morning when [Child] was dropped off at school. On the week preceding Father's weekend custody, Mother would be granted partial custody with [Child] from Wednesday at 5:30 p.m. to Friday morning[,] when [Child] was dropped off at school. During the summer months, custody was shared on a week on/week off basis, with Mother having an additional seven (7) days during the summer months.

Trial Court Opinion, 8/17/18, at 6−7, 9.

The trial court set forth the procedural background, as follows:

[Father] filed a Complaint for Custody on May 5, 2015, seeking primary physical custody of H.S. ([Child]). As a result, a Custody Conciliation Conference was scheduled for May 21, 2015. On May 14, 2015, [Mother] filed a Petition for Special Relief, requesting custody be returned to the custody schedule the parties had been operating under independent of the [c]ourts. Additionally, Mother stated Father was withholding [Child] from her as a result of an incident in October of 2014, whereby [Child] had an inappropriate interaction with another child. Mother was

- 2 -

aware of the incident at the time and did not tell Father about it. Rather, Father learned of the incident through a comment made to him by [Child] around the time he filed the Custody Complaint. In response to Mother's Petition for Special Relief, the [c]ourt entered a Temporary Order directing the parties to resume the status quo custody schedule, whereby Mother had custody of [Child] from 5:30 p.m. every Friday to the beginning of school on Monday morning. On May 22, 2015, the parties entered into a Custody Agreement, whereby [primary] physical custody of [Child] was awarded to Father[,] with partial [physical] custody rights vested in Mother. During the school year, Mother was granted partial custody with [Child] on the first, second, third, and any fifth weekend of every month from 5:30 p.m. on Friday to the beginning of school on Monday morning. Additionally, during the week preceding Father's weekend custody, Mother was granted partial custody with [Child] from 5:30 p.m. on Wednesday to the beginning of school on Friday morning. In the summer months, the parties shared custody on a week on/week off basis. Mother also consented to Father relocating to Moon Township, Pennsylvania[,] in the Agreement. Additionally, the parties share[d] legal custody of [Child].

On August 17, 2017, Mother filed a Petition for Modification and a Petition to Prevent Relocation and Return of Child, stating Father unilaterally removed [Child] to West Virginia. The [trial court] fashioned an [o]rder prohibiting Father from removing [Child] from Moon Township, Pennsylvania[,] without following the proper procedures for relocation. Additionally, custody was to immediately transfer to Mother should Father move without proper authority[,] and a Custody Conciliation Conference was scheduled for September 27, 2017.

On January 29, 2018, Mother filed a Petition for Contempt, alleging Father was living in West Virginia and that [Child] was residing with Paternal Grandparents on a full-time basis in violation of the August 17, 2017 [o]rder. Also on January 29, 2018, Father filed a Petition for Modification, stating the parties disagree as to [Child's] need for ADHD [("Attention Deficit Hyperactivity Disorder")] medication and alleging that Mother is unfit in managing her custody time. As a result of both petitions, a Custody Conciliation Conference was scheduled for March 8, 2018.

On or around the date of the scheduled [m]otion to set a Custody Conciliation Conference, [the trial court] received a typed letter signed by [Child] in this matter. The letter was delivered and addressed to [the trial court's] Chambers. The letter was forwarded to the Hearing Officer assigned to the Custody Conciliation Conference. [The trial court] did not, at that time, read the letter, as it deemed it an inappropriate ex-parte [sic] communication[,] and[,] as its contents could be potentially prejudicial . . ., and[,] eventually[,] [the trial court], spoke with [Child] in person.

On March 21, 2018, a Proposed Order was entered [by the Hearing Officer,] awarding physical custody of [Child] to Mother, with partial custody rights vested in Father, whereby Father has custody of [Child] on the first, second, third, and fifth weekends of every month from 5:30 p.m. on Friday to the beginning of school on Monday during the school year. Additionally, on the week preceding Mother's weekend custody, Father [was] granted partial custody with [Child] from 5:30 p.m. on Wednesday to the beginning of school on Friday morning. During the summer months, custody [was to be] shared on a week-on/week-off basis, with custody exchanges to take place at 5:30 p.m. on Sundays. Legal custody was directed to be shared by the parties.

On April 9, 2018, Father filed Exceptions to the Proposed Custody Order of March 21, 2018, stating the Hearing Officer erred by not reducing Mother's physical custody as: Mother failed to disclose to Father a sexual abuse incident that occurred in 2014; Mother takes [Child] to bars and/or leaves her in the care of neighbors during Mother's custody time; [Child] is tardy to school during Mother's custody time; Mother refuses to consider ADHD medication as recommended by [Child's] therapist; and Mother discusses this custody case with [Child]. Additionally, Father stated he does not desire to relocate to West Virginia, nor has he already relocated himself or [Child]. In response to Father's Exceptions, [the trial court] scheduled a Pre-Trial Conference for May 21, 2018. After the failure of the parties to reach an agreement at the Pre-Trial Conference, a Custody Trial was scheduled for July 20, 2018.

On June 7, 2018, Father filed a Petition to Consolidate his request to relocate with the [c]ustody [t]rial, as Father served a "Notice of Proposed Relocation" requesting permission to relocate to Washington County, Pennsylvania[,] on May 25, 2018 [on]

Mother's counsel. As a result, an [o]rder was entered by [the trial court] stating the Relocation Hearing was to be held contemporaneously with the scheduled [c]ustody [t]rial on July 20, 2018. However, as a result of [the trial court's] inquiry at [t]rial, Father, through his counsel, stated on the record that Father already [had] physically relocated to his new residence in Washington County. Mother, on the record through her counsel, did not object to his relocation. As such, both parties agreed that the statutory relocation factors were not required to be addressed [at trial or] in [the trial court's opinion and order].

Trial Court Opinion, 8/17/18, at 1–4.

At the custody trial on July 20, 2018, the trial court questioned Child, *in camera*, with counsel for both parties present. Thereafter, Father's counsel questioned Child on direct examination, and Mother's counsel conducted cross-examination of Child. N.T. (*in camera*), 7/20/18, at 4–111. Father and Mother testified on their own behalves. N.T., 7/20/18, at 9–192, 195–257.

At the commencement of the second day of the custody trial, on August 1, 2018, counsel for Father presented a "Motion in Limine-Inclusion of Expert Testimony," and counsel for Mother presented an Answer to Father's motion. The trial court denied the motion, and Mother's testimony continued. N.T., 8/1/18, at 5–14, 15–67. Father then presented the testimony of his wife, J.S. and, *via* telephone, his mother, R.S. ("Paternal Grandmother"). **Id.** at 67–106, 109–127. Mother presented the testimony of her mother, C.L. ("Maternal Grandmother"); Father's aunt, K.T.; the director of admissions at Trinity Christian School, Brenda Kirkland; and the scheduling specialist for the standardized patient program at the University of Pittsburgh, April Arnone.

*Id.* at 127–152, 154–164, 168–184, 188–194. Father then testified on

rebuttal. *Id.* at 196–224.

Based on the testimonial and documentary evidence presented at the

hearing, the trial court set forth its findings of fact:

> At [t]rial, Father admitted that he obtained a [United States Post Office Box] in Moon Township[,] as Father testified there was a pattern of stolen mail at his apartment in Moon Township, but [Father] maintained at [t]rial that he also maintained a residence in Moon during that time. In May of 2018, Father signed a six (6)[-]month lease for a new apartment in Moon Township after [Child's] school questioned Father's residence within the district. The actual details of where Father and [Child] resided in the last year were difficult to ascertain at [t]rial, except that a minimal amount of time was actually spent in Moon Township. Mother testified she filed a Petition to Prevent Relocation in August of 2017, as [Child] told her that she and Father had relocated to West Virginia, suggesting that they were spending large amounts of time in [Stepmother's] former residence. Additionally, Paternal Grandmother testified that[,] during the 2017-2018 school year, [Child] resided with Paternal Grandparents frequently[,] as Father was at work. What periods of time Father and [Child] were residing in Father's Moon Township apartment or with Paternal Grandparents or with [Stepmother] were difficult to ascertain. However, Father testified that he was only spending one (1) night "here and there" with [Stepmother] in West Virginia[,] and a substantial amount of time at Paternal Grandparents' home in Hopewell, Beaver County, Pennsylvania.
>
> [Child] attended elementary school in Moon Township, Pennsylvania[,] from 2016 to the end of the 2018 school year, where she was successful in her studies. (Defendant's' Ex. 2). [Child] did have some behavioral issues. [Child] was transported to and from school frequently by Paternal Grandparents. However, [Child] did have a notable amount of tardies and absences, both excused and unexcused. Many of the days when [Child] was tardy corresponded to the days in which it was Mother's responsibility to transport [Child] to school. Mother testified that she had a difficult time anticipating traffic on such mornings and did not adequately budget the appropriate amount of time.

[Child's] behaviors were contested by the parties at [t]rial and involved the larger disagreement between the parties surrounding whether or not [Child] should take medication for [ADHD]. Father, [Stepmother], and Paternal Grandmother all testified as to concerns with [Child's] behavior, such that she has a difficult time focusing and can be irritable. Conversely, Mother and Maternal Grandmother testified that they do not observe any issues with [Child] focusing or any concerning behaviors to suggest she should be taking ADHD medication.

In June of 2018, Father, [Stepmother], [his] two (2) step-children[,] a daughter, age nine (9) and a son who has autism, age eleven (11), purchased a home and moved to Washington County, Pennsylvania. This move was contrary to the existing Court Order dated March 21, 2018. [Stepmother] and her children had previously resided in Wheeling, West Virginia. Father testified at [t]rial that he moved to Washington County to maintain the current distance between Father's and Mother's residences and shorten his commute to work, as the new commute from his home in Washington County to his job in Greene County was substantially decreased. [Stepmother] works as a nurse in Columbus, Ohio. Both Father and [Stepmother] work long shifts. Because [Stepmother] now works three (3) back-to-back twelve (12)[-]hour shifts in Columbus, she often stays with friends or in [Airbnbs] overnight during these periods. Due to her schedule, Father, who also works extended shifts, coordinates his time around [Stepmother's] to ensure that one of them is home and available to the three (3) children in their household.

Mother works a variety of jobs, including [as] a tour guide on the Gateway Clipper Fleet, a performance artist, and a standardized patient with the University [o]f Pittsburgh School [o]f Medicine. While she has no set schedule, Mother does have a lot of flexibility in formulating her weekly work shifts[,] and has worked various positions at these jobs for substantial periods of time. For example, Mother has worked as a standardized patient for seven (7) years. Her employer verified her dedication and ability to perform her job. Mother often brings [Child] with her to some of her workplaces when appropriate[,] and when she can ensure proper supervision of [Child]. Mother has many artistic interests and friends in such communities. Mother often attends events and sometimes goes on out-of-state trips, both with and without [Child], that are connected to these interests, such as attendance at a Cirque du Solei [sic] production.

* * *

At [t]rial, Father proposed that he have primary custody of [Child] Sunday night through the beginning of school on Fridays[,] with Mother exercising partial custody every other weekend. Additionally, Father proposed [Child] be enrolled in elementary school in the Washington County School District. Mother proposed that she have primary custody of [Child], with Father exercising partial custody during the school year three (3) weekends a month, as well as mid-week visitation. Mother also proposed the parties continue to share legal custody and that summers be shared between the parties. Additionally, Mother proposed [Child] attend Trinity Christian School in Pittsburgh.

Currently, the parties operate under the Agreed Order[,] with Father exercising primary custody during the school year[,] and Mother having partial custody. The parties share custody during the summer months on a week-on/week-off basis.

Trial Court Opinion, 8/17/18, at 7–10.

The trial court entered an order on August 17, 2018, denying Father's exceptions to the Hearing Officer's recommendation, maintaining shared legal custody in the parties, awarding Mother primary physical custody and Father partial physical custody. Pursuant to the custody schedule, Father would have partial physical custody of Child during the school year for the first, second, and fourth weekend of each month from 6:00 p.m. on Friday until 6:00 p.m. on Sunday. The first weekend meant the first full weekend of the month beginning on a Friday. During the summer, Father was to have partial physical custody on a week-on/week-off basis. The parties were to exchange physical custody every Sunday at 6:00 p.m. Both parties were to exercise their vacation during their custodial time. The trial court awarded Father one

- 8 -

additional week of partial physical custody during the summer months. Trial Court Opinion and Order, 8/17/18, at 24–27.

Thereafter, Father filed a motion for reconsideration on September 19, 2018. After oral argument on the motion, the trial court denied reconsideration in an order entered on September 19, 2018. In the meantime, on September 4, 2018, Father timely filed a notice of appeal, along with a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

In his brief on appeal, Father raises the following issues:

A. Whether the [trial court] erred by failing to admit relevant testimony of Sarah Dean, [Child's] treating therapist, when [Mother] was willfully uninvolved in the treatment process, did not request contact information until much later in therapy despite having the therapist's name, and did not seize the opportunity to make contact after being provided with said information.

B. Whether the [trial court] erred by considering [Father's] move to Washington County a "relocation" under PA Custody Relocation Rule [Pa.R.C.P.] 1915.17(a), even though [Father's] new residence was located only slightly further than his previous residence to [Mother's] residence, ultimately failing to "significantly impair" [Mother's] custodial rights. Also, even if the [trial court] was correct in its characterization, whether the [trial court] failed to consider the benefit of the move on [Child].

C. Whether the [trial court] erred by giving little weight to the letter written [by Child] to the [trial court] when all parties testified that [Child] took it upon herself to write without her father's influence.

D. Whether the [trial court] erred by not giving any weight to [Child's] preference articulated in chambers to remain with her father.

- 9 -

E. Whether the [trial court] erred by failing to consider Mother's behavior in the presence of and causing safety concerns for [Child], including driving [Child] while intoxicated on Mother's Day.

F. Whether the [trial court] erred by failing to give proper weight to [Mother's] inability to take [Child] to school on time and her lax attitude towards [Child's] schooling and absenteeism.

G. Whether the [trial court] erred by giving primary or considerable weight to school choice, thereby deflecting [Mother's] history of poor behavior and judgement while [Child] was in her care.

H. Whether the [trial court] erred by determining that [Father's] relationship with [Child] was inadequate for [Child's] well-being when the record supports the opposite conclusion.

Father's Brief at 2–3.

In custody cases filed under the Child Custody Act ("the Act"), 23 Pa.C.S. §§ 5321–5340, our standard of review is as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. This Court must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. We defer to the credibility determinations of the presiding trial judge, who viewed and assessed the witnesses first-hand. We, however, are not bound by the trial court's deductions or inferences from its factual findings, and ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the trial court's conclusions only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*P.J.P. v. M.M.*, 185 A.3d 413, 417 (Pa. Super. 2018) (internal quotation marks, citations, and brackets omitted).

- 10 -

We have defined abuse of discretion as "not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused." *Bulgarelli v. Bulgarelli*, 934 A.2d 107, 111 (Pa. Super. 2007) (quoting *Arbet v. Arbet,* 863 A.2d 34, 39 (Pa. Super. 2004)).

> Regarding the trial court's exercise of discretion, we have stated:
>
> The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting *Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

In his first issue, Father argues that the trial court erred when it excluded relevant expert testimony of Child's treating therapist without examining the probative value it would have provided to the trier of fact. Father's Brief at 2. Father asserts that, because the trial court refused to consider the therapist's expert report, as well as her recommendations within the report, the trial court totally discounted uncontradicted expert testimony. *Id.* at 17. According to Father, the trial court abused its discretion when it focused exclusively on Father's actions in choosing the therapist rather than on Mother's willful non-involvement. *Id.*

Pursuant to Pa.R.E. 703, we observe that the decision of whether to admit or exclude evidence is committed to the sound discretion of the trial court. **Buchhalter v. Buchhalter**, 959 A.2d 1260, 1263 (Pa. Super. 2008). The admission of evidence, including expert scientific testimony, is within the purview of the trial court's discretion. **In re C.M.T.**, 861 A.2d 348, 355 (Pa. Super. 2004). "The decision to admit or to exclude evidence, including expert testimony, lies within the sound discretion of the trial court. Generally, we review a trial court's evidentiary rulings for abuse of discretion[.]" **Id**. (internal quotations and citations omitted). As stated above, "[a]n abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused." **Bulgarelli**, 934 A.2d at 111.

Here, in excluding Ms. Dean's testimony and expert report, the trial court reasoned as follows:

At the commencement of the second day of [t]rial on August 1, 2018, counsel for Father presented a "Motion *in Limine*-Inclusion of Expert Testimony." Counsel for Mother also presented an Answer to Father's Motion. In his Motion, Father alleged that the testimony of [Child's] therapist, Sarah Dean, should be included at [t]rial as Father notified Mother of [Child's] change in therapist and later provided Mother with Ms. Dean's contact information. Additionally, Father argued that Mother failed to contact Ms. Dean before [t]rial and present a Motion *in Limine* seeking to exclude Ms. Dean's expert testimony. Father also argued that the law does not require a therapist to have the consent of both parents in order to treat a minor child. In her

Answer, Mother stated that she only consented to [Child's] therapeutic treatment with her previous therapist, referred to during [t]rial as Claudia, and not with Ms. Dean. Mother also stated that she requested information concerning Ms. Dean from Father on numerous occasions[] but was not provided with such information from Father until the Conciliation Conference and after such time as [Child] had been in counseling at Father's sole discretion. Mother also argued that the inclusion of Ms. Dean's testimony would be prejudicial, as Ms. Dean was unilaterally selected by Father, only seen by Father and [Child], and Father did not provide Mother with Ms. Dean's information [or] include Mother in any appointments. Counsel for Mother stated, on the record, her office attempted to contact Ms. Dean on several occasions and received no response.

After both parties stated their arguments and positions concerning Father's Motion *in Limine* on the record, [the trial court] denied Father's Motion. As per Rule 403 of the Pennsylvania Rules of Evidence, a court may "exclude relevant evidence if its probative value is outweighed by a danger of . . . unfair prejudice. . ." Here, [the trial court] determined that Ms. Dean's testimony would be unfairly prejudicial, as it would be one-sided since Mother was not included in the decision to employ Ms. Dean as [Child's] therapist, nor was Mother involved in [Child's] therapy. Additionally, while Mother was aware and in support of [Child] receiving therapeutic treatment, she was not made aware by Father of Ms. Dean's information, which Mother requested. Mother was originally only told that the therapist was from Ohio. As such, any probative value Ms. Dean's testimony or report would have produced is outweighed by its inherent unfair prejudice to Mother.

Even more, this [c]ourt opined that to grant Father's Motion would be to condone Father's violation of the parties' Custody Order in which it states both Mother and Father share legal custody. "Legal Custody" is defined by our statute as "the right to make major decisions on behalf of the child, including, but not limited to, medical religious and educational decisions." 23 Pa.C.S. § 5322. Deciding to take [Child] to a particular therapist is such a decision that falls within the scope of legal custody. Because the parties share legal custody, this was not Father's decision alone to make. Father failed to include Mother in not only the decision to employ Ms. Dean and permit Mother to be involved,

but also failed to provide Mother with Ms. Dean's contact information within a reasonable time.

Trial Court Opinion, 8/17/18, at 4–6.

Upon review, we find no abuse of discretion or error of law. The record supports the trial court's factual findings regarding Father's unilateral choice of a therapist. N.T., 7/20/18, at 142–147, 183–188; 229–233; N.T., 8/1/18, at 32–35, 219; Defense Exhibit 7. Moreover, its conclusion that the proffered expert testimony and report were not admissible is without error. Father admittedly "spent a lot of time and money trying to have [the therapist] come in [to court] and criticize [Mother's] moral turpitude." N.T., 8/1/18, at 219. By choosing to take Child to a therapist without Mother's prior knowledge and approval, Father violated the parties' agreement to shared legal custody, which agreement was made an order of court. Custody Agreement, 5/21/15, at ¶ I.B.; Order of Court, 5/21/15. Rather than acknowledge his violation, Father blames Mother for not contacting the therapist and participating in Child's therapy, a position we consider disingenuous. By acting unilaterally, Father undermined any argument that the therapist's testimony and report were probative as to whether Mother has emotionally manipulated Child.

Father's second through eighth issues challenge the trial court's application of the statutory custody factors. With any custody case decided under the Act, the paramount concern is the best interests of the child. *See* 23 Pa.C.S. § 5328. Section 5328(a) sets forth the best interest factors that the trial court must consider:

## § 5328.  Factors to consider when awarding custody

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328. Trial courts are required to consider "[**a**]**ll** of the factors listed in [S]ection 5328(a) . . . when entering a custody order." *J.R.M. v. J.E.A.,* 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original). Furthermore:

Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, "[S]ection 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328(a) custody] factors prior to the deadline by which a litigant must file a notice of appeal." *C.B. v. J.B.,* 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 (Pa. 2013). . . .

In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v.*

- 16 -

> **M.L.G.**, 63 A.3d 331, 336 (Pa. Super. 2013), *appeal denied*, [620 Pa. 710], 68 A.3d 909 (2013). A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d). **Id.**

**A.V. v. S.T.**, 87 A.3d 818, 822-823 (Pa. Super. 2014).

The Act provides for seven types of physical and legal custody awards to achieve the child's best interests. 23 Pa.C.S. § 5323(a)(1–7). **Accord S.W.D. v. S.A.R.**, 96 A.3d 396, 400 (Pa. Super. 2014) ("When a trial court orders a form of custody, the best interest of the child is paramount.") (citation omitted). Moreover, upon petition, a trial court may modify a custody order if it serves the best interests of the child. 23 Pa.C.S. § 5338.

In the opinion accompanying its August 17, 2018 order, the trial court addressed all of the Section 5328(a) factors.[1] Trial Court Opinion, 8/17/18, at 10–23. Based on its Section 5328(a) analysis, the trial court reached the following conclusion:

> In summation, and in light of the foregoing application of the Section 5328(a) factors, this [c]ourt determines the following to be in the best interest of [Child].
>
> Mother is granted primary physical custody of [Child]. Father shall be granted partial physical custody as outlined in the attached Order. Additionally, [Child] shall be enrolled in Trinity School for the 2018-2019 school year, as the quality of the school will best serve [Child] in her future academic success. While it is

---

[1] The trial court found that factors (1), (4), (8), (9), and (13) favor Mother; factors (2), (2.1), (5), (10), (11), and (12) are neutral; factor (3) is largely neutral but slightly favors Father; factor (6) slightly favors Father; factors (7), (14), and (15) are not applicable; additional concerns under factor (16) are neutral. Trial Court Opinion, 8/17/18, at 10–22.

clear both parties love [Child], this [c]ourt believes it is in [Child's] best interest to be in the primary custody of Mother.

*Id.* at 22.

In his second issue, Father argues that the trial court erred by considering his move from Moon Township to Washington County to be a "relocation" under Pa.R.C.P. 1915.17(a), although his new residence is located only slightly farther than his previous residence from Mother's residence and thus, did not "impair" Mother's custodial rights. Father's Brief at 18. Father complains that, even if relocation was not an issue at the time of the custody trial, the trial court should have focused on Mother's inappropriate parenting abilities and her inappropriate behavior. *Id.* at 20.

Following the trial, the trial court characterized Father's relocation from Moon Township to Washington County as a non-issue, and the parties agreed. N.T., 8/1/18, at 228–230, 238–239. Nevertheless, it addressed how the move impacted Child as part of its Section 5328(a), subsections (4) and (11) analyses:

> [A]t the conclusion of the two (2)[-]day [t]rial, the parties stated on the record that Plaintiff/Father's request for relocation is no longer at issue[,] as Father has moved and purchased a house[,] and Mother no longer objected, as he had already relocated; thus, only his Exceptions to the Proposed Custody Order of March 21, 2018 are the subject of [t]rial and this decision.

\* \* \*

**(4) The Need for Stability and Continuity in the Child's Education, Family Life, and Community Life**

This factor favors Mother. This factor is paramount in this case as [Child's] school will change for the 2018-2019 school year regardless of the custody arrangement, as [Child] will no longer be attending her agreed[-]upon previous school district due to Father's move. For the past two (2) years, [Child] has attended the Moon School District in Moon Township. [Child] performed well academically. As previously discussed in this Opinion, Father and Mother agreed to Father having primary [physical] custody of [Child] so that she could attend school in Moon, as it has high educational standards and Mother wanted [Child] to have the best educational opportunity. Presently, Mother proposes that [Child] attend Trinity, a private Christian school in the Wilkinsburg neighborhood of Pittsburgh. Conversely, Father proposes that [Child] attend school in the Washington County School District, where he now resides.

At [t]rial, there was much evidence and testimony presented by Mother surrounding the qualifications of both schools, with Mother posturing that Trinity has more educational advantages than the elementary school in Washington County. For example, Brenda Kirkland, Director of Admissions at Trinity, testified that the school has approximately three–hundred (300) total students enrolled in the school, which is comprised of all grades from kindergarten to twelfth grade. Ms. Kirkland also stated that the school has higher standardized test scores as compared to the rest of the state. Additionally, in 2017, all members of the graduating class matriculated into colleges or universities. The school would provide busing to [Child] from Mother's neighborhood, as Mother lives approximately twenty (20) minutes from the school. Mother is an alumnus of the school[,] and Maternal Grandmother was employed by the school as a teacher for twenty (20) years.

Ms. Kirkland also confirmed that [Child] had toured the school and passed the entrance exam around the time of [t]rial, meaning she would be offered admission. Tuition for the school is approximately Eight Thousand and 00/100 Dollars ($8,000.00) per year. Mother testified that she, along with the assistance of Maternal Grandparents, would be responsible for paying tuition, and hoped to also qualify for financial aid from the school. Ms. Kirkland also explained to the [c]ourt that the administration works well with children with two (2) households to ensure that both parents are given independent access to the school computer

system where they can keep abreast of [Child's] grades, schedules, and activities.

Mother presented profiles of both schools obtained through online school summaries.[3]  Mother presented a school profile of the proposed elementary school, Washington Park, in Washington County.  The profile ranked the school 1,148 of 1,547 elementary schools in the state[,] according to www.schooldigger.com.  (Defendant's Ex. 1)  The profile also stated that in 2017, "Washington Park Elementary School ranked worse than 74.2% of elementary schools in Pennsylvania."  *Id.*  Conversely, Mother presented a school profile of Trinity stating the school ranked 42 of 75 private K-12 schools in the state according to "Niche."  *Id.*

[3] Father did not present ample evidence at [t]rial to discuss the merits of [Child's] proposed elementary school in Father's new location, nor [sic] contradict the statistics Mother presented.

\* \* \*

**(11) The Proximity of the Residences of the Parties**

This factor is neutral and favors neither party.  However, it should be noted that Father relocated in contravention of the current Court Order and, while his new residence is comparable to the distance between his previous residence and Mother's, the motivation for his move as evidenced on the record was to be closer to his job. Father's move was not for the benefit of [Child], as the school district he relocated to, according to the statistics presented, is academically inferior to [Child's] previous district, where Father resided.

Trial Court Opinion, 8/17/18, at 1, 12–13, 17–18.

Our review confirms support in the record for the trial court's factual findings regarding Father's living arrangements in Moon Township, West Virginia, and Washington County.  N.T. (*in camera*), 7/20/18, at 80–85; N.T., 7/20/18, at 74–89, 110–113, 160–162; 220–222; N.T., 8/1/18, at 69–72, 85–86, 117–118.  Moreover, we discern no error in the trial court's legal

conclusion that the move from Moon Township to Washington County was not motivated by Child's best interests. Father's decision to move was in contravention of a custody order, which prohibited Father from moving out of Moon Township. Order, 8/17/17. Father testified that he knew he would have "been in violation" if he moved without court permission. N.T., 7/20/18, at 117, 183–184. As justification for violating the court order, Father testified that he moved the family to Washington County so they could all live together and so he would be closer to his job in Greene County. N.T., 7/20/18, at 79; N.T., 8/1/18, at 17-18. Father's wife testified that they moved to Washington County "because of work." N.T., 4/1/18, at 71, 72, 82. Father explained that he rented an apartment in Moon Township and provided Child's school with a Moon Township post office box number, even though they did not consistenly live in the Moon Township apartment. N.T., 7/20/18, at 84, 122–125. He also acknowledged that the distance from the school in Washington County to Mother's house is twice the distance from the school in Moon Township. *Id.* at 181. Father did not dispute Mother's testimonial or documentary evidence that the school district in Washington County is academically inferior to Child's previous school district in Moon Township. N.T., 7/20/18, at 189–191; N.T., 8/1/18, at 53–54, 139–142, 168-184, 191–192, 208–209, Defense Exhibit 1.

Contrary to Father's argument, the trial court did not consider the instant matter to be a custody relocation case. Trial Court Opinion, 8/17/18, at 1. However, to the extent that the trial court used the word "relocated" in

relation to Father's move to Washington County, the trial court did, in fact, consider the motivation behind Father's move and determined that it was contrary to Child's best interest. Thus, we discern no basis for relief.

As for Father's alternative argument about Mother's behavior, the record supports the trial court's finding that Mother provided a stable, loving environment for Child. N.T., 7/20/18, at 196–200, 203, 234–238, 242–247, 250–251, Defense Exhibits 3, 4. Therefore, we discern no error in the trial court's conclusion that Mother's parenting skills were not a factor that favored Father. Trial Court Opinion, 8/17/18, at 7-8, 12-13, 17.

In his third issue, Father complains that the trial court placed too little weight on a letter allegedly written by Child to the trial court. Father's Brief at 21. After describing the pro-Father contents of the letter, Father argues the letter was entitled to greater weight as "part of [Child's] expression of preference." *Id.* at 23.

The trial court addressed the letter in its Section 5328(a), subsection (16) analysis:

> [T]his [c]ourt finds it necessary to address the letter that was sent by [Child] directly to the Chambers of this Judge on the exact date of a scheduled Motion which scheduled the Custody Conciliation Conference in this matter. While the contents of the letter will not be discussed in this Opinion, this [c]ourt is troubled by the very existence of the letter itself. [Child] is ten (10) years old. This [c]ourt would be concerned if any minor child who is the subject of a custody case before this [c]ourt independently submitted a letter for consideration. For example, here, [Child], who had never been acquainted with this [c]ourt, learned the name of this Judge, the address of the Courthouse, the Courtroom of Chambers, and the specific date when a Motion would be

presented to this [c]ourt.  Father testified that he did in fact tell [Child] the name of this Judge.  However, both parties testified they did not help [Child] write the letter.  Paternal Grandmother later testified at [t]rial that [Child] wrote the letter at school while in her care.  According to Paternal Grandmother, [Child] asked the Paternal Grandparents to help her type, address, and mail the letter, to which the Paternal Grandparents obliged.

During the *in-camera* interview with [Child], [Child] testified that it was her idea to write the letter and that no one helped her with the actual writing.  [Child] did acknowledge that Paternal Grandparents helped her mail the letter and that she did ask Father where to send it.  The mature nature and specifics of the letter are troubling to this [c]ourt.  [Child] does well in school, but this [c]ourt doubts that she composed the letter alone and that she also independently took the initiative to submit a letter to this [c]ourt.  While this [c]ourt will not articulate an opinion as to the origins of the letter, it does appropriately consider its existence and gives it its proper weight in reaching its conclusions.

Trial Court Opinion, 8/17/18, at 21–22.

We discern no abuse of discretion or legal error in the trial court's ruling.

The record supports the trial court's factual findings about the letter.  N.T. (*in camera*), 7/20/18, at 55–62; N.T., 7/20/18, at 136–141, 184–185; 8/1/18, at 113–114, 116–119.  Moreover, the trial court was in the best position to assess the maturity and credibility of Child—as well as Father's and Paternal Grandmother's backstories about the letter—and to determine the weight it should accord to the letter.  *C.R.F.*, 45 A.3d at 443; *Ketterer*, 902 A.2d at 540.  We will not substitute our judgment for that of the factfinder.  *P.J.P.*, 185 A.3d at 417.

Father's fourth issue challenges the trial court's failure to give greater weight to Child's articulated preference during her *in camera* interview to live

with Father. Father's Brief at 23. While acknowledging "[t]he weight attributable to a child's testimony can best be determined by the judge before whom the child appears," Father questions the trial court's characterization of Child as immature and her testimony incredible. *Id.* at 26.

The trial court addressed this issue in the context of Section 5328(a), subsection (7):

**(7) The Well-Reasoned Preference of the Child, Based on the Child's Maturity and Judgment**

This [c]ourt conducted a lengthy *in-camera* interview with [Child] before [t]rial commenced with counsel for both parties present. From this outset, this [c]ourt notes that [Child's] maturity and judgment was concerning, thus making the credibility of her statements in the interview questionable. [Child] was described at [t]rial as a "people pleaser[,]" and that characterization was clear during the interview, as some of her answers appeared formulated as to not anger one of her parents. For example, [Child] had a selective memory when asked certain questions and struggled when giving full accounts on both simple and more complex matters. In a similar vein, some of the language and phrases used by [Child] were used by Father during his testimony. Additionally, [Child] appeared to be aware of things regarding this case and the parties' relationship that are inappropriate for her to know and have learned, unless by being told. Despite the above information, it was clear to this [c]ourt that [Child] loves both of her parents, enjoys her time while in both of their care, and is appropriately cared for in both of their care. She was attentive to questioning, focused, and calm during the lengthy *in camera* questioning by the [c]ourt and both counsel. While [Child] has been exposed to adult topics and behaviors inappropriate for a child of her age, it was too difficult for this [c]ourt to fully ascertain who has told her what, as [Child] was not clear in her answers and accounts of past events, where her accounts and opinions were inconsistent. Therefore, based upon the observations by this [c]ourt and the lack of maturity of [Child], she was not asked specifics about her desired living arrangements.

Trial Court Opinion, 8/17/18, at 14–15.

Again, we discern no abuse of discretion or error of law. The record supports the trial court's factual findings regarding Child's testimony. *See* N.T. (*in camera*), 7/20/18, at 50–55, 62–65. Moreover, the trial court was in the best position to observe Child's demeanor, assess her maturity, and determine the weight to be accorded her preference testimony. *C.R.F.*, 45 A.3d at 443; *Ketterer*, 902 A.2d at 540. Faced with a cold record, we will not substitute our judgment for that of the factfinder.

Father's fifth issue concerns the trial court's failure to consider Mother's behavior of driving while intoxicated on Mother's Day, which posed a safety risk to Child. Father's Brief at 29. According to Father, the trial court "conflated two separate events occurring at Mother's one (1) workplace[,]" when Mother was "roofied"[2] and, on the second occasion, "almost wrecked the car with [Child] in it." *Id.* at 29, 30.

Our review of the record confirms that Child referred to Mother being "roofied" on two occasions, one of which was on Mother's Day. N.T., 7/20/18 (*in camera*), at 71–72. Mother described getting sick while hosting a Mother's Day event at Hambone's Bar. N.T., 7/20/18, at 255–256; N.T., 8/1/18, at

---

[2] "Flunitrazepam is a powerful sleep-inducing drug, which is commonly known as a "roofie" or a "date-rape" drug." Inna Zazulevskaya, CARACHURI-ROSENDO V. HOLDER: TO BE DEEMED CONVICTED OF AN AGGRAVATED FELONY, AN ACTUAL CONVICTION IS REQUIRED, 44 Loy. L.A. L. Rev. 1215, 1232 (2011) (citing Jerrold S. Meyer & Linda F. Quenzer, Psychopharmacology: Drugs, the Brain, and Behavior 371 (2005)).

19–20.  She also described being "roofied," *i.e.* drugged, at Hambone's Bar on one occasion when Child was not with her.  N.T., 8/1/18, at 19.  Mother denied posting on Facebook that she was "roofied" again on Mother's Day, that she drove home on Mother's Day while impaired, or that she almost "wrecked" the car.  N.T., 8/1/18, at 21–22.  The trial court refers to only one incident of Mother being "roofied," in May of 2018, with no mention of Mother's Day:

> **(14) The History of Drug or Alcohol Abuse of a Party or Member of a Party's Household**
>
> This factor is inapplicable and favors neither party, as neither party alleged at [t]rial a history of drug or alcohol abuse by the other party.  However, it should be noted that Mother was "roofied" while working one (1) of her regular jobs in May of 2018 at a restaurant/bar in which she frequently hosts events.  The minor child was not present at the event.  However, Mother unknowingly being drugged does not evidence a drug issue even though Father, during testimony, blames Mother for this unfortunate event.

Trial Court Opinion, 8/17/18, at 19.

We discern no abuse of discretion or error of law.  Contrary to Father's allegation on appeal that Mother was "roofied" on Mother's Day, he testified at trial that Mother "went out to a bar for Mother's Day and had too much to drink, got sick and had to have somebody come pick her up, her and [Child] up from the bar."  N.T., 7/20/18, at 70.  As the factfinder, the trial court was free to credit Mother's contrary version of the Mother's Day event.  Even if the trial court believed Child's and Father's allegations about the Mother's Day incident, Section 5328(a)(14) concerns a history of drug or alcohol abuse, not

a single allegation of impaired driving. Here, Father presented no evidence that Mother had a history of drug or alcohol abuse, and the trial court—as factfinder—was free to resolve in Mother's favor the allegation that she drove on Mother's Day while impaired. Thus, we discern no basis for relief.

In his sixth issue, Father contends that the trial court failed to give proper weight to Mother's inability to take Child to school on time and her lax attitude toward Child's schooling and absenteeism. Father's Brief at 30. According to Father, "[b]y skirting the issue of Mother's habitual lateness, the [t]rial [c]ourt did not properly consider [Child's] daily educational needs." *Id.* at 31.

The trial court addressed Father's concerns in the context of Section 5328(a), subsections (3) and (10):

> **(3) The Parental Duties Performed by Each Party On Behalf of the Child**
>
> This factor is largely neutral, but slightly favors Father. . . [T]here was evidence that Mother struggled with getting [Child] to school on time due to miscalculating traffic. Also, Mother appeared more lenient when determining what constitutes good cause to allow [Child] to be absent from school. While Mother's actions will be given the appropriate weight, both parties performed parental duties on [Child's] behalf.
>
> * * *
>
> **(10) Which Party is More likely to Attend to the Daily Physical, Emotional, Developmental, Educational, and Special Needs of the Child**
>
> This factor is largely neutral. Both parties can and do support [Child's] daily physical, emotional, developmental, educational, and special needs. Father and Paternal Grandparents

- 27 -

have mainly attended to [Child's] daily needs, due to Father's primary custody, such as transportation to and from school the majority of time, providing food for [Child], as well as helping her with homework.

Similarly, Mother has, with some difficulty, transported [Child] to school during her custody time, assists in helping [Child] explore her artistic side, and teaches her practical skills, such as cooking. Both parents monitor [Child's] needs at school and are involved in her interests.

Trial Court Opinion, 8/17/18, at 11–12, 17.

We discern no abuse of discretion or error of law. Mother acknowledged that Child was sometimes tardy during Mother's custody and that Mother allowed Child to stay home from school when she was unwell, when school was not mandatory, or when Child was up late the night before at a family function. N.T., 7/20/18, at 244–245; N.T., 8/1/18, at 40–43. However, Father frequently relied on his own parents to assist him in transporting Child to and from her school in Moon Township and caring for her approximately fifty percent of the time due to his work schedule. N.T., 7/20/18, at 76, 119–121; N.T., 4/1/18, at 80, 111. Moreover, Child testified that she arrived late to school sometimes while in Father's custody because they drove from West Virginia to Moon Township. N.T. (*in camera*), 7/20/18, at 25. Father also acknowledged that he was responsible for some of Child's tardiness because he drove her to school from Greene County where he was working. N.T., 7/20/18, at 112. Moreover, Child testified that she earns good grades in school. N.T. (*in camera*), 7/20/18, at 75. Father, Mother, and Stepmother all testified that Child's tardiness and absences have not impeded her grades.

Father's Brief at 31; N.T., 7/20/18, at 131–133; N.T., 8/1/18, at 41, 81. Contrary to Father's assertions, we find nothing in the record to disaffirm the trial court's conclusion that Mother's parenting style did not weigh in favor of Father. Trial Court Opinion, 8/17/18, at 11–12, 17.

In his seventh issue, Father complains that the trial court gave considerable weight to school choice,[3] "thereby deflecting [Mother's] history of poor behavior and judgement [sic] while [Child was] in her care." Father's Brief at 31. According to Father, "school choice was *a* consideration, but not *the sole* consideration." ***Id.*** at 33.

We agree with Father that school choice was a factor for the trial court's consideration. We disagree with Father that school choice was the sole consideration by the trial court in awarding Mother primary custody. Rather, the trial court clearly considered school choice in the context of its determination of best interests and its examination of the Section 5328(a) factors in light of the testimony and documentary evidence. Trial Court Opinion, 8/17/18, at 10–22. Essentially, Father invites us to reweigh the evidence in an attempt to convince us to arrive at a different result. We decline the invitation to substitute our judgment for that of the trial court. ***P.J.P.***, 185 A.3d at 417.

---

[3] ***See S.W.D. v. S.A.R.***, 96 A.3d 396, 403 (Pa. Super. 2014) ("[T]he choice of a child's school may factor into a trial court's decision to award a form of custody when the trial court is addressing a request to establish or change legal or physical custody in connection with the choice of school.").

- 29 -

Lastly, Father argues that the trial court erred in concluding that Father's relationship with Child was inadequate to support her well-being as primary custodian. Father's Brief at 33. Providing instances of his proactive approach to raising Child versus Mother's "laid-back position," Father concludes that, "[i]f Father did not advance [Child's] well-being, the case never would have been brought to trial." *Id.* at 35.

The trial court addressed Father's conduct in the context of Section 5328(a), subsections (8) and (9):

**(8) The Attempts of a Parent to Turn the Child Against the Other Parent, Except in Cases of Domestic Violence Where Reasonable Safety Measures Are Necessary to Protect the Child from Harm**

This factor favors Mother. Testimony and evidence at [t]rial illustrated Father's attempts to turn [Child] against Mother. For example, Father told [Child], a now ten (10)[-]year-old, that Mother cheated on him and [that] was the reason for their divorce. Such information is not only inappropriate to share, but, whether intentional[] or not, prejudices [Child] against Mother. Additionally, Father, in light of a custody[-]exchange incident that transpired during the pendency of [t]rial, testified that he willingly disobeyed the Custody Order according to [Child's] "judgment." This action was after Mother accommodated Father's request for a change in exchange time, which required her to have assistance with someone else picking up [Child] for her. The current operating Order does not place limitations on the individuals who may conduct exchanges.

Similarly, at [t]rial, Father turned all experiences [Child] shares with Mother into a negative. For example, Father voiced numerous concerns that Mother brings [Child] with her to work, even though she provides adequate supervision for [Child] on such occasions[,] and the places and experiences are appropriate for and enjoyable [to Child]. Additionally, Father characterized [Child] bringing Mother breakfast in bed as evidence that Mother is hungover, when[,] in actuality, [Child] enjoys cooking.

Moreover, whether obvious or subtle, Father attempts to turn [Child] against Mother, whereas this [c]ourt was presented with no testimony of any similar actions of Mother.

**(9) Which Party is More Likely to Maintain a Loving, Stable, Consistent, and Nurturing Relationship With the Child Adequate for the Child's Emotional Needs**

This factor favors Mother. Father attempts to prevent Mother from having a consistent, stable, and nurturing relationship with [Child]. Mother is more likely to maintain a loving and stable relationship with [Child] that will support [Child's] emotional needs. While it is clear that both parents love [Child], Father is not willing to understand or support the relationship [Child] has with Mother. As such, his attitude influences [Child] and impedes his ability to sustain an emotionally nurturing relationship with her. For example, Father hindered Mother's ability to support [Child] when he changed [Child's] counselor without having Mother be involved in the decision or future therapy. Additionally, as previously discussed, Father has withheld [Child] from Mother on several occasions and has exposed [Child] to inappropriate details of both the parties' personal relationship and this custody matter. These actions affect [Child's] emotional well-being. As such, Father does not maintain a relationship with [Child] adequate for her emotional needs.

Trial Court Opinion, 8/17/18, at 15–17.

We discern no abuse of discretion or error of law. The record supports the trial court's finding that Father maintained a disapproving, hostile attitude toward Mother, was unable to cooperate with her, and manipulated his living arrangements to serve his own needs. N.T., 7/20/18, at 147–154, 161–162, 217–218. The trial court heard all of the testimony and reviewed all of the evidence presented at the two-day custody trial. It was in the best position to assess the credibility of the witnesses and the best interests of Child. *C.R.F.*, 45 A.3d at 443; *Ketterer*, 902 A.2d at 540. Once again, we decline

- 31 -

Father's invitation to reexamine the evidence and reach a conclusion that favors him. **P.J.P.**, 185 A.3d at 417.

The trial court's award of primary physical custody to Mother is supported by competent evidence in the record; it is not unreasonable or an error of law. **C.R.F.**, 45 A.3d at 443. Accordingly, we affirm the order of the trial court.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/15/2019